STATE OF VERMONT

SUPERIOR COURT                                    ENVIRONMENTAL DIVISION

Docket No. 46-4-12 Vtec

|  |  |
|---|---|
| **True North Wilderness Programs** } | Appeal from District 5 Env. Commission |
| **Act 250 Permit Application Appeal** } | |
| **(Case No. 5W1538)** } | |

## STIPULATED DECISION ON THE MERITS

This appeal has been the subject of numerous efforts by the parties to negotiate a voluntary resolution of all legal disputes concerning an application for a state land use ("Act 250") permit. As the parties and the Court prepared for an eventual trial, the parties were able to reach a full resolution of their disputes. As a part of the parties' resolution, they submitted a proposed draft of Findings of Fact, Conclusions of Law, and Order, as well as a proposed Act 250 Permit, to be issued by the District 5 Environmental Commission.

We have accepted and adopted the parties proposed Findings, Conclusions, and Order, with only minor formatting changes. In particular, we concluded that what this Court issues should be in the form of a Merits Decision. We have also listed the Exhibits referenced in this Merits Decision on the last page of this Decision, for ease of reference and clarity of the Decision itself.

## FINDINGS OF FACT

### Procedural History

On July 2, 2010, True North Wilderness Programs, LLC ("True North") filed Conditional Use Application 3333-CU with the Waitsfield Development Review Board ("DRB") for the construction of tent platforms, a yurt/yome, and composting toilets to serve a primitive wilderness therapy program ("the Project") on a 25-acre tract located off Dana Hill Road in the Town of Waitsfield ("the Property"). On December 20, 2010, the Waitsfield DRB granted True

1

North's Conditional Use Application, and issued a zoning permit ("the DRB Permit"), attached as *Exhibit 1*.

The Waitsfield DRB's decision was based in part on Wastewater and Potable Water Supply Permit WW-5-5562 ("the WW Permit"), issued by the Vermont Agency of Natural Resources ("ANR") on September 13, 2010 for the Project's composting toilets. On March 10, 2011, Ms. Kincaid (Kinny) Perot filed a Notice of Appeal with regard to Permit WW-5-5562 ("the WW Appeal"). The WW Appeal was assigned Docket Number 36-3-11 Vtec. On April 4, 2011, the Court placed the WW Appeal on inactive status, pending the outcome of True North's application for an Act 250 permit.

On January 18, 2011, True North filed application 5W1538 with District 5 Environmental Commission ("District Commission"). A minor notice and draft proposed permit were circulated on February 22, 2011. Timely hearing requests were filed by adjoining landowners Russell Chalom and Kincaid Perot on February 27 and March 14, 2011, respectively. On April 28, 2011, True North filed a revised application and site plans. The District Commission determined that substantive issues had been raised by the adjoining property owners under Criteria 1, 1(A), 1(B), 2, 3, 4, 5, 8, 8(A), 9(K) and 10 and convened hearings on July 19, 2011 and October 14, 2011. The District Commission issued its Findings of Fact and Conclusions of Law and Order on December 30, 2011, ruling against True North on all the Act 250 criteria at issue except Criterion 1 (Water & Air Pollution). True North filed a notice of appeal on or about April 2, 2012, with a statement of questions inquiring whether the Project complies with criteria 1(A), 1(B), 2, 3, 4, 5, 8, 8(A), 9(K), and 10 ("the Act 250 Appeal"). The Act 250 Appeal was assigned Docket Number 46-4-12 Vtec.

On May 4, 2012, Ms. Perot filed a cross-appeal in the Act 250 Appeal.

2

On May 24, 2012 Ms. Perot filed a motion for party status and a statement of questions.

On July 2, 2012, True North moved to dismiss all of Ms. Perot's questions and objected to her request for party status.

On March 14, 2013, the Court issued its Decision on Motion for Party Status. The Court granted Ms. Perot's motion for party status as to Act 250 Criteria 1, 1(A), 1(B), 1(E), 4, 8, 8(A), and 10, and denied her party status as to Act 250 Criteria 2, 3, 5, and 9(K). The Court's ruling on party status answered Questions 1-10 and 21, 22, 24, and 25 in Ms. Perot's Statement of Questions (relating to her motion for party status), making True North's motion to dismiss Ms. Perot's Statement of Questions moot as to those questions. The Court granted True North's motion to dismiss Ms. Perot's Questions 15, 16, 17, and 20. The Court advised that it would address in a subsequent decision True North's motion to dismiss the remaining portions of Ms. Perot's Statement of Questions: Questions 11-14, 18, 19, 23, 26, and 27.

On November 13, 2013, the Court issued an Entry Regarding Motion which denied True North's motion for summary judgment.

On November 21, 2014, the Parties entered into a settlement agreement with respect to Docket Nos. 36-3-11 Vtec and 46-4-12 Vtec (the "Settlement Agreement"). The Settlement Agreement is *Exhibit 4.* Attached to *Exhibit 4* is *Exhibit A*, the agreed-upon overnight use zone (i.e., "green zone").

On January 23, 2015, Thomas Barefoot, III, Joni Zweig, Plum Creek, LLC, and True North Wilderness Programs, LLC moved to join and substitute parties under V.R.C.P. 20 and 25(c). The Court granted the motion on January 26, 2015. In support of the motion, the movants stated, in part, "In both dockets [i.e., Docket Nos 46-4-12 Vtec and 36-3-11 Vtec] substitution is appropriate under the provisions of V.R.C.P. 25(c), as since the commencement of this

proceeding, Applicants Thomas Barefoot and Joni Zweig have transferred their interest in the underlying property to Plum Creek, LLC." However, it appears that an unintentional mistake was made in the motion for substitution as the conveyance from Thomas Barefoot and Joni Zweig was to Plum Creek Holdings, LLC by warranty deed of Thomas E. Barefoot, III and Joni Zweig, dated February 14, 2014, and recorded in Book 153, Pages 108-109 of the land records of the Town of Waitsfield, Vermont, and as confirmed by the February 14, 2014 conveyance of a Vermont Confirmatory Warranty Deed by Thomas E. Barefoot, III and Joni Zweig to Plum Creek Holdings, LLC which the Waitsfield Town Clerks Office received for recording on April 10, 2014, and which is recorded at Book 153, Pages 261-262 of the land records of the Town of Waitsfield, Vermont. *Exhibit 13*.

On January 27, 2015, the Court dismissed the WW Appeal, vacated the WW Permit, and remanded the matter to ANR to adjudicate a revised permit application. On the same day, the Court stayed the Act 250 Appeal, pending issuance of a revised permit by the Waitsfield DRB.

On June 23, 2015, ANR issued Wastewater and Potable Water Supply Permit 5-5562-2R ("the Revised WW Permit"), attached as *Exhibit 6*.

On December 29, 2015, the Waitsfield DRB issued Findings of Fact and Notice of Decision 3671-CU, amending the original DRB Permit (3333-CU), and on January 26, 2016, the Waitsfield DRB issued Findings of Fact and Notice of Decision 3671-CU-R. The Waitsfield DRB Findings of Fact and Notice of Decision #3671-CU-R, January 26, 2016 ("the Revised DRB Permit") is attached as *Exhibit 9*.

On June 28, 2016, Ms. Perot filed a motion requesting that the unintentional mistake of making Plum Creek, LLC a party be corrected such that the proper substitution of parties is for

4

Plum Creek Holdings, LLC. True North and the Natural Resources Board consented to the motion.

This matter is now before the Court for final disposition.

## General Findings

1. The Project applicants are True North Wilderness Program, LLC, and its principals, Madhurii Barefoot and Tyler Maves ("True North").

2. The Project co-applicant is Plum Creek Holdings, LLC. Madhurii Barefoot and Tyler Maves are the member-owners, member-managers of Plum Creek Holdings, LLC. Plum Creek Holdings, LLC owns the 25.3-acre parcel that is to be used for the Project (the "Project Tract"). *Exhibit 13*.

3. The Project Tract has a street address of 1732 Dana Hill Road. The Project Tract is identified as #29032.000 and is located in Waitsfield's Agricultural-Residential and Forest Reserve Zoning Districts. The Project Tract is described at Book 153, Pages 261-262 of the Town of Waitsfield Land Records. *Exhibit 13*.

4. The Project's layout is depicted on the site plan attached as *Exhibit 7*.[1]

5. True North Wilderness Program is a wilderness therapy program with a focus on primitive camping for its students. The program uses the Project Tract, along with nearby state and national forest lands, for hiking and camping.

6. Frances Kincaid (Kinny) Perot, f/k/a Kincaid Connell, f/k/a Kincaid Perot Connell owns approximately 135 acres of land. A portion of Ms. Perot's land adjoins the Project Tract. Ms. Perot first bought a portion of her land with a camp on December 9, 1983 with her now

---

[1] Exhibit A to Exhibit 4 depicts the so-called "green zone," and is to be used solely for that purpose. Exhibit 7 is to be used to locate all other Project components.

former husband. Ms. Perot and her now former husband made a second purchase on December 10, 1986. Ms. Perot's land is located in the towns of Warren and Waitsfield.

7. On April 13, 1993, Ms. Perot became the sole owner of her land by Quitclaim Deed of John Connell, Book 65, Pages 409-410 of the Town of Waitsfield land records, and Volume 100, Pages 393-394 of the Town of Warren land records (*Exhibit 14*); and by Quitclaim Deed of John Bonnefond Connell, Book 65, Pages 411-412 of the Town of Waitsfield land records, and Volume 100, Pages 397-398 of the Town of Warren land records (*Exhibit 15*).

8. True North Wilderness Programs, LLC, Plum Creek Holdings LLC, Ms. Perot, and Richard Czaplinski (the current spouse of Ms. Perot), have reached a settlement agreement regarding the Project. The Settlement Agreement is *Exhibit 4* (the "Settlement Agreement").

9. The Settlement Agreement requires that the terms of settlement shall be made conditions to any zoning permit and Act 250 permit necessary for implementing the terms of settlement. In addition, the terms of settlement shall constitute critical permit conditions under the *Stowe Club Highlands/Hildebrand*/"flexibility versus finality" analysis. The Settlement Agreement also requires that the terms of settlement shall be set forth as restrictive covenants. The Settlement Agreement establishes, in part, the basis for affirmative findings under Act 250 Criteria 1, 1(A), 1(B), 1(E), 4, 8, 8(A), and 10.

10. The Settlement Agreement includes attached *Exhibit A*. The Project's overnight use of the Project Tract is limited to a portion of the Project Tract, as depicted on *Exhibit A*, in the color green. The area depicted on *Exhibit A* is referred to in the Settlement Agreement as the "green zone." The Settlement Agreement also includes references to "Mod" and "Ty" who are, respectively, Madhurii Barefoot and Tyler Maves.

6

11. As set forth at *Exhibit 4*, Settlement Agreement, True North Wilderness Programs, LLC, Plum Creek Holdings LLC, Ms. Perot, and Mr. Czaplinski have agreed as follows, and the Court so finds:

> *1.     Usage.*
>
> *a.        There will be a maximum of 20 students and staff on site for overnight use of the property.  Additional staff may be present briefly during the daytime hours and for operational purposes. Student ages range from 13–18 years in the adolescent groups and 18–22 years in the young adult groups.  Both adolescent and young adult groups may be present.*
>
> *b.        So-called "Winter use" may be full time. "Winter-use" shall be defined as November 1 through May 1.*
>
> *c.        During the remainder of the year, overnight usage is limited to the periods each week commencing Monday at noon to Friday at 3:00 p.m., with no limits on consecutive night usage within such period.*
>
> *2.     Spatial Representation of Use.*
>
> *a.        Overnight use of the property shall be limited to a portion of the property set forth on attached Exhibit A, also referred to herein as the "green zone."  As illustrated on Exhibit A, it is the area surrounded in green.  No structures will be constructed for use by True North outside of the overnight use area, and the existing yome and composting toilet outside of this designated overnight area will be removed and relocated to an area inside the overnight usage area upon True North obtaining necessary permits to do so.  Additionally, no structures or overnight camping activities shall be permitted within 100 feet of the creek in the "Creekside" area of Exhibit A.  The entirety of property may be used for daytime use.*
>
> *b.        The True North-related structures on the property shall be limited to two tent platforms, three composting toilets, and one yome or yurt-like structure.  No catholes shall be permitted on the property.*
>
> *3.     Safety, security, access and insurance.*
>
> *a.        Appropriate liability insurance shall be maintained with Ms. Perot, and her heirs or successors, as a named insured.*
>
> *b.        True North shall at all times oversee and appropriately manage its students and staff.  True North will clearly direct their staff and students that True North staff, students, guests, invitees, and agents are prohibited from entering onto the Perot property.  True North shall not prevent Perot from using the Perot property.  Ms.*

7

*Perot as well as Mod and Ty shall mark the boundary lines of their properties and ensure that students and staff know not to enter on the Perot property.*

*c.        There shall be no interference with the use of the right-of-way for ingress and egress to the Perot property.  Similarly, Ms. Perot and associated family and friends will not interfere with the ingress and egress to the Plum Creek property by True North or by Mod and Ty and associated friends and family.*

*4.        Permit Conditions and Declaration of Covenants.*

*a.        The terms of settlement shall be made conditions to any zoning permit and Act 250 permits necessary for implementing the terms of settlement.  The terms of settlement shall constitute critical permit conditions under the Stowe Club Highlands/Hildebrand/"flexibility versus finality" analysis.*

*b.        The terms of settlement shall be set forth as restrictive covenants.*

*5.        Cooperation with True North Permitting.*

*a.        Perot shall not object to, oppose, or otherwise assist any other party to oppose any permit or amendment applications as are necessary for implementation and permitting of the project and for implementation of the terms of this settlement agreement, including any rights of the Applicant to obtain an Act 250 permit from the Environmental Division incorporating the terms of this settlement agreement.*

*b.        In the event that True North, in implementing the terms of this settlement agreement, seeks any variances in connection with the relocation of structures within the so-called "green zone" set forth in Exhibit A, and such variance requests involve setbacks from the Perot property line, Perot reserves the right to oppose such variance requests.*

*c.        Restrictive covenants to be declared and properly recorded upon expiration of all applicable permit appeal periods and True North obtaining such permits as are necessary for the implementation and permitting of the project agreed to by the settlement agreement.*

*d.        The parties agree to request that the current litigation be stayed pending the outcome of True North's attempt to obtain all permits necessary for implementation of this agreement.  The Parties reserve the right to proceed with the pending litigation in the event that True North is not able to obtain final permits necessary to fully implement the settlement agreement.*

*6.        Personal Use of Property.*

*No part of this agreement shall be construed as limiting the personal use of the property by Madhurii Barefoot and Tyler Maves.*

12. *Exhibit 16* is the Grant of Restrictive Covenants which will be recorded in the Town of Waitsfield land records in accordance with the Settlement Agreement. The Project Tract is the "Restricted Property" set forth in the Grant of Restrictive Covenants.

13. *Exhibit 7* is the site plan. The site plan, and these findings and accompanying permit, depict three camping sites, referred to as the Upper, Old Growth, and Creekside Sites. True North is authorized to use any of these three sites, and to dismantle and construct tent platforms on any of these three sites at will, subject to the reclamation/erosion controls included on the Project site plan and the limitation, among others, that there shall be no more than two tent platforms on the Project Tract at any one time.

14. The factual findings contained herein replace and supersede the permit application and schedules previously submitted by True North.

### Act 250 Criteria

**Sections 6086(a)(1)(B) – Waste Disposal**

15. True North has obtained five wastewater permits. They are: WW-5-5562, 9/13/10; WW-5-5562-Revised, 11/15/10; WW-5-5562-1, 2/11/11; WW-5-5562-1, 2/11/11 "Corrected Permit"; and most recently, *Exhibit 6*, Wastewater System and Potable Water Supply Permit 5-5562-2R (June 23, 2015).

16. The Project will conform to *Exhibit 6*.

17. The Project will use 3 composting toilets for solid waste disposal. *Exhibit 6*.

18. The composting toilet vaults will be cleaned out by a septic pumping company as needed. *Exhibit 5*.

9

19.  True North will practice "leave no trace" primitive camping, which is defined as camping in a forest with no development facilities and leaving the site with little or no evidence of human visitation. *Exhibit 10.*  The Green Mountain Forest allows primitive camping consistent with the practice of Leave No Trace, which involves seven principles:

> *1. Plan Ahead and Prepare*
> *2. Travel and Camp on Durable Surfaces*
> *3. Dispose of Waste Properly*
> *4. Leave What You Find*
> *5. Minimize Fire Impact*
> *6. Respect Wildlife*
> *7. Be Considerate of Other Visitors*

20.  The Revised DRB Permit specifies that no "catholes" (shallow holes used to dispose of human waste) will be permitted on the Project Tract. *Exhibit 9.*

21.  The Project will conform to the Settlement Agreement (*Exhibit 4*) and the restrictive covenants required by the Settlement Agreement.  In addition, the Settlement Agreement provides:  *The terms of settlement shall constitute critical permit conditions under the Stowe Club Highlands/Hildebrand/"flexibility versus finality" analysis.*  Conformance with the Settlement Agreement will ensure the Project's conformance with *Exhibit 6*, Wastewater System and Potable Water Supply Permit 5-5562-2R (June 23, 2015).

*Conclusion*

Under Act 250 Rule 19(E), *Exhibit 6*, Wastewater System and Potable Water Supply Permit 5-5562-2R (June 23, 2015), creates a presumption of compliance with Criterion 1(B). The Project will be operated in conformance with *Exhibit 6*.  Compliance with *Exhibit 6* will include proper maintenance and limitations on the number of staff and students present at the Project.  The Project will not use "catholes" to dispose of human waste.  Compliance with *Exhibit 6* will also ensure that the Project's waste disposal needs comply with the Settlement Agreement (*Exhibit 4*), and the restrictive covenants (*Exhibit 16*).  In addition, the terms of

10

settlement shall constitute critical permit conditions under the *Stowe Club Highlands/ Hildebrand/*"flexibility versus finality" analysis. Accordingly, the Project will comply with Criterion 1(B).

**Sections 6086(a)(2) – Water Availability, &**
**6086(a)(3) – Impact on Existing Water Supply**

22. Water supply for the Project will consist of a new private drilled well and associated storage tank and piping. *Exhibit 6.*

23. The Revised WW Permit authorizes a potable water supply using a new well for a maximum of 820 gallons of water per day. *Id.*

24. The Revised WW Permit authorizes three tent platform sites and a yurt/yome at the locations shown on the site plan, serving no more than 20 campers (inclusive of students and staff) per day. *Id.*

*Conclusion*

In light of the Revised WW Permit, and *Exhibit 4*, the Court finds that the Project will not have an undue adverse impact with regard to Criteria 2 or 3. *See* Act 250 Rule 19(E)(3)(a) (wastewater and potable water supply permit established rebuttable presumption that a sufficient supply of potable water is available).

**Section 6086(a)(4) – Soil Erosion and the Capacity of the Land to Hold Water**

25. Two composting toilets have already been constructed, one of which shall be removed by the Permittees. The Permittees shall notify Ms. Perot prior to the clean-out and removal activity. Two composting toilets will then be constructed, consistent with the Revised DRB Permit and the Settlement Agreement (*Exhibit 4*), for a final total of three. Additionally, True

11

North proposes to construct two tent platforms, relocate the existing yome, and add a drilled well. The Permittees shall notify Ms. Perot prior to the well being drilled. There will also be a properly maintained non-motorized hiking trail constructed in accordance with Trail Fundamentals and Trail Management Objectives (2001 USFS) within the vegetated stream buffer adjacent to the Creekside site, provided that it does not result in undue soil erosion and is located within the area depicted on *Exhibit 7*. The exact location of said hiking trail will be identified on the site plan and the updated site plan shall be submitted to the District Environmental Commission not later than 30 days after the commencement of construction of the trail, with a copy simultaneously provided to Ms. Perot when provided to the Commission.

26. The Project's compliance with the Settlement Agreement, and the restrictive covenants, will prevent any erosion impacts to Ms. Perot's land. In addition, the Settlement Agreement provides: *The terms of settlement shall constitute critical permit conditions under the Stowe Club Highlands/Hildebrand/"flexibility versus finality" analysis.*

27. The Project site plan includes the following proposed reclamation/erosion controls, applicable to all soils disturbed during construction activities:

> *All disturbed soils will be stabilized with seed and hay/straw mulch within one day of completion of construction and no later than 7 days after initial disturbance.*
>
> *All seeding will be with Agway Sun and Shade Mix applied at a rate of 80 pounds per acre plus an additional 20 pounds per acre of winter rye seed, hay/straw mulch will be applied to all exposed areas at a rate of 3 tons per acre (3" minimum thickness).*

*Exhibit 7.*

28. These measures will be implemented in the following areas:

> *Upper Camping Site and Old Growth Site*
> *All disturbed soils resulting from the construction of the proposed tent platform and the proposed composting toilet.*

12

*Creekside Camping Site*
*All disturbed soils resulting from the construction of the proposed tent platform, the area surrounding the existing composting toilet, the area surrounding the site of the removed tent platform, and the slopes between the removed platform site and the toilet which were eroded during the large spring storms.*

*Drilled Well and Reservoir*
*All disturbed soils resulting from the construction of the new drilled well, reservoir and water line connections, any other areas on the plum creek property which are disturbed by true north construction activities.*

*Id.*

### *Conclusion*

The Project's operation is limited to set numbers of students and staff. Thus, the Court finds that the Project's construction and operation not have an undue adverse impact with regard to Criterion 4, provided that the erosion control measures incorporated into the plan are implemented, the Project complies with the Settlement Agreement, including the recording of restrictive covenants, and that the terms of settlement shall constitute critical permit conditions under the *Stowe Club Highlands/Hildebrand/*"flexibility versus finality" analysis for any necessary additional construction activities.

**Section 6086(a)(5) – Transportation**

29. Access to the Project during the week will be via Dana Hill Road, a Class 4 town road. *Exhibit 8.*

30. In the alternative, the Project is accessible on foot via the Camel's Hump public trailhead at Tucker Hill Road, a hike of approximately 1.5 miles. *Id.*

31. The State of Vermont Department of Forests, Parks and Recreation (F&P) issued license #17107 on August 9, 2016, which authorized True North to primitive camp within all of

Camel's Hump State Park (except for the Stevens block south of Route 17 in Buels Gore and Phen Basin Block north of Route 17 in Fayston), and within the Cram Hill, Rice and Vogt Blocks of Roxbury State Forest.  *Exhibit 2*.

32.   The Project will be accessed via Dana Hill Road every day.  Most trips will occur during the week.

33.   True North presently owns two vans, one minivan, and one truck.

34.   True North also owns three snowmobiles and one all-terrain vehicle ("ATV") for site access in snowy conditions.

35.   Access on foot from the Camel's Hump public trailhead is at Tucker Hill Road (hike is 1.5 miles).  Tucker Hill Road is maintained year-round.

36.   Therapists usually hike in from Tucker Hill Road to visit groups twice a week.

37.   When groups of students enter or leave the Project tract, or pick up a new student, they typically do so via Tucker Hill Road.

38.   Student groups rarely walk up Dana Hill Road itself to the Project tract (less than once per month), but can do so when necessary.  Student groups usually hike in and out via trails to the Tucker Hill Road Camels Hump trailhead.

39.   Because Dana Hill Road bisects the Howe Block of the Camels Hump State Forest, student groups often cross the road to access other trail systems.

40.   True North uses vehicles on Dana Hill Road for such purposes as exchanging field guides, re-rationing student groups, transporting parents to graduations, transporting an individual student to a doctor's appointment, etc.

41.   Weekly round trips are as follows: 15 trips maximum; 12 trips average (10–13 trips Monday-Friday and 1–2 trips on weekends).

14

42. Other than True North, current traffic on Dana Hill Road varies greatly by the season and is largely recreation driven. Estimates of other traffic range from 47–69 weekly round trips during peak (rifle hunting) season to 12–24 weekly round trips outside of hunting season. Thus, True North traffic is about 18–24 percent of total traffic during hunting season and 38–55 percent of total traffic outside of hunting season.

43. The Dana Hill Road traffic estimates are derived from the following information. There are 6 camps/homes along the road, two of which are close to the bottom of the road and one of which is used infrequently. The three remaining properties—Plum Creek, Chalom, and Perot—are near the end of the road and, apart from True North's use of the Project Tract, are accessed on a seasonal basis. These property owners and the State of Vermont sometimes conduct forestry and other property maintenance operations. Weekly estimate: 7–14 round trips during spring, summer and fall.

44. Mountain bikers and others use the road regularly to recreate, maintain mountain bike trails, and work on the road. Weekly estimate: 5–10 round trips during spring, summer and fall.

45. During hunting (rifle) season, it is not uncommon to see 5–10 trucks parked along the road on any given day. Weekly estimate: 35–45 round trips during hunting season.

46. The Settlement Agreement (*Exhibit 4)* includes a condition prohibiting interference with ingress and egress to the Perot or Project Tract properties.

*Conclusion*

The Project will involve approximately 4 round trips per day, including for septic removal (and no more than 10 trips per day, except in cases of emergency). This modest traffic will not have an undue adverse impact with regard to Criterion 5.

15

**Section 6086(a)(8) – Aesthetics, Scenic Beauty, Historic Sites, & Natural Areas**

47. There are no historic sites or rare and irreplaceable natural areas which will be affected by the Project.

48. The Project Tract consists of fields and woods and is primarily surrounded by forest.

49. The proposed tent platforms are raised flat wooden surfaces that support white fabric tents in the winter. The composting toilets are constructed largely of wood. The yome is made of white fabric wall, a dark green fabric roof, and a wooden door.

50. The Settlement Agreement establishes specific limitations on the Project's operation, including limits on the number of staff and students, the days on which they may be present during the seasons of the year, and the areas allowed for overnight use (the *Exhibit A* to *Exhibit 4* "green zone"). The Project's compliance with the Settlement Agreement, including the operational limitations, will mitigate the aesthetic impacts of the Project's construction and operation in relation to the surrounding rural character of the area. In addition, the Settlement Agreement provides: *The terms of settlement shall constitute critical permit conditions under the Stowe Club Highlands/Hildebrand/"flexibility versus finality" analysis.*

51. As part of the Settlement Agreement, the Project Tract boundary lines will be marked to ensure that True North's staff, students, guests, invitees, and agents are prohibited from entering onto Ms. Perot's property.

52. True North has developed a Prohibition of Trespass Policy which specifies that "[a]ll staff will be instructed so as to be able to clearly recognize and identify the boundaries between" the True North and Perot parcels, and specifies that all staff and students must "remain on property that they are authorized to use." *Exhibit 3.* The policy incorporates a map, agreed to between the parties, delineating the authorized areas. *Exhibit 4.* The Project will comply with these requirements.

16

*Conclusion*

The Project requires a handful of small structures that are well suited to their environment. The Parties have concluded the Settlement Agreement. Overall, the Project is subject to limitations on its operation such that the impact to Ms. Perot will be properly mitigated. The Project will comply with the Settlement Agreement. In addition, the terms of settlement shall constitute critical permit conditions under the *Stowe Club Highlands/Hildebrand*/"flexibility versus finality" analysis. Thus, the Court finds that the Project will not have an undue adverse impact with regard to Criterion 8.

**Section 6086(a)(8)(A) – Necessary Wildlife Habitat**

53. The Project Tract is adjacent to deer wintering habitat. However, a wildlife evaluation by Arrowwood Environmental detected no sign of winter deer use. *Exhibit 11*.

54. The wildlife evaluation concluded that the likely wildlife impacts of the Project are "all in all minimal" and not unduly adverse. *Exhibit 11*.

55. True North requests, and the Court orders, that the permit include the following standard condition:

> *All employees and guests are hereby put on notice that this facility is in the immediate vicinity of a deer wintering area. Domestic dog activity seriously jeopardizes this critical habitat and the existence of the deer in this area. A person who owns or handles a dog that is not leashed or otherwise under the owner's immediate control is subject to the penalties of 10 V.S.A. Section 4748 (Dogs Pursuing Deer) and section 4514 (Possession of Flesh and Game).*

56. The Agency of Natural Resources agrees with the addition of this condition. *Exhibit 18*.

57. The Settlement Agreement requires that there not be any use of "catholes." In addition, the Settlement Agreement provides: *The terms of settlement shall constitute critical*

17

*permit conditions under the Stowe Club Highlands/Hildebrand/"flexibility versus finality" analysis.*

58.    The Project will comply with the *Exhibit 6*, Wastewater System and Potable Water Supply Permit 5-5562-2R (June 23, 2015).  Compliance with the permit will ensure proper disposal of human wastes so that there is no impact to wildlife associated with the human activity from the Project.

59.    The area within True North's property (and 100 feet beyond) is not actively being utilized during the winter months by white-tailed deer and is not Necessary Wildlife Habitat for deer.  *Exhibit 17.*

*Conclusion*

Based upon the Settlement Agreement, and Wastewater System and Potable Water Supply Permit 5-5562-2R (June 23, 2015), the Project's construction and operation are of relatively modest scale and impact.  While there will be additional human activity due to the Project, the limitations on the Project's construction and operation under the Settlement Agreement will ensure that the Project does not have an undue adverse impact with regard to Criterion 8(A).  In addition, the terms of settlement shall constitute critical permit conditions under the *Stowe Club Highlands/Hildebrand/*"flexibility versus finality" analysis.

**Section 6086(a)(10) – Conformance with the Local or Regional Plans**

60.    The Town of Waitsfield duly adopted a municipal plan on June 27, 2005.  The plan was re-adopted on July 26, 2010.  *Exhibit 12*.

61.    The Project Tract is located within the Town of Waitsfield's designated Agricultural Residential District and the Forest Reserve District.

62. The Plan specifically sets out provisions intended to be mandatory and to have regulatory effect. In particular, "outdoor recreation" uses are permitted in the Forest Recreation District and "land based uses (e.g., recreation, extraction)" are permitted in the Agricultural Residential District.

63. The Plan is meant to allow for land development in the Town in an orderly way that minimizes any adverse impacts of that development.

64. The limitation on development in the Forest Reserve District to "forestry, outdoor recreation, small seasonal camps, and year-round residential dwellings below an elevation of 1,700 feet" is specifically for the purpose of protecting significant forest resources.

65. As set forth in the Settlement Agreement, the Parties have agreed to conditions governing the time, manner, and location of the Project's operation on the Project Tract. In addition, the same time, manner and location conditions shall be made restrictive covenants to the Project Tract, and the Settlement Agreement provides: *The terms of settlement shall constitute critical permit conditions under the Stowe Club Highlands/Hildebrand/"flexibility versus finality" analysis.*

66. Camping and hiking uses in the Forest Reserve District are consistent with the Plan.

*Conclusion*

In connection with True North's Motion for Summary Judgment, the Court previously ruled on November 13, 2013 that although it appeared that the Project conformed to the Waitsfield Town Plan, summary judgment was precluded by the fact that the parties had not had an opportunity to present evidence on the version of the proposal then before the Court. The parties have since reached agreement on the proposal and on the conditions listed above, as set forth in the Settlement Agreement. In addition, the terms of settlement shall constitute critical

19

permit conditions under the *Stowe Club Highlands/Hildebrand*/"flexibility versus finality" analysis. Accordingly, the Project complies with Criterion 10.

## **Order**

For all the reasons stated above, we conclude that the Project as now presented and detailed in the parties' Settlement Agreement (Exhibit 4) conforms to all applicable Act 250 criteria (10 V.S.A. §6086(a)). We therefore **APPROVE** the project as proposed. We remand the pending application to the District 5 Environmental Commission so that the Commission may perform the ministerial act of issuing an Act 250 Permit that conforms to this Stipulated Decision on the Merits and the parties' Settlement Agreement.

Counsel for Applicants is directed to provide the District Commission with courtesy copies of this Stipulated Decision on the Merits, accompanying Judgment Order, all Exhibits, and revised site maps.

This concludes the current proceedings before this Court concerning this appeal. A Judgment Order accompanies this Stipulated Merits Decision.

Electronically signed on April 4, 2017 at Newfane, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division

20

## List of Exhibits

*Exhibit 1.*    *Waitsfield DRB zoning permit 3333-CU (Dec. 20, 2010).*

*Exhibit 2.*    *Dept. of Forests, Parks & Recreation license 17107 (August 9, 2016).*

*Exhibit 3.*    *True North Prohibition of Trespass Policy.*

*Exhibit 4.*    *Settlement Agreement, by and between True North Wilderness Programs, LLC, Plum Creek Holdings LLC, Kincaid Perot, and Richard Czaplinski, including attached Exhibit A, November 21, 2014 (the "Settlement Agreement").*

*Exhibit 5.*    *Wastewater System and Potable Water Supply Permit Application (Mar. 23, 2015).*

*Exhibit 6.*    *Wastewater System and Potable Water Supply Permit WW-5-5562-2R (June 23, 2015).*

*Exhibit 7.*    *"Camping Sites Site Plan," Sheet C-1, dated 3/20/15, last revised 3/10/17.*

*Exhibit 8.*    *USGS map showing location of Dana Hill Road and Tucker Hill Road.*

*Exhibit 9.*    *Waitsfield DRB zoning permit 3671-CU-R (Jan. 26, 2016).*

*Exhibit 10.*   *Primitive Camping Materials.*

*Exhibit 11.*   *Jeffrey Parsons, Arrowwood Environmental, Wildlife Evaluation (Nov. 9, 2010).*

*Exhibit 12.*   *Excerpts from Waitsfield Town Plan (2005).*

*Exhibit 13.*   *Vermont Confirmatory Warranty Deed from Thomas E. Barefoot, III and Joni Zweig, to Plum Creek Holdings, LLC, Book 153, Pages 261-62, Town of Waitsfield Land Records, April 9, 2014.*

*Exhibit 14.*   *Quitclaim Deed by John Connell to Kincaid Connell, Book 65, Pages 409-410 of the Town of Waitsfield land records, and Volume 100, Pages 393-394 of the Town of Warren land records, April 13, 1993.*

*Exhibit 15.*   *Quitclaim Deed by John Bonnefond Connell to Kincaid Perot Connell, Book 65, Pages 411-412 of the Town of Waitsfield land records, and Volume 100, Pages 397-398 of the Town of Warren land records, April 13, 1993.*

*Exhibit 16.*   *Declaration of Covenants.*

*Exhibit 17.*   *Jeff Parsons, Arrowwood Environmental, Inc., Letter to True North (July 11, 2016).*

*Exhibit 18.*   *Letter dated February 24, 2017 from John Austin, Agency of Natural Resources, regarding DWA related permit condition.*